UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| NORTH AMERICAN CLEARING, INC., | ) | Case No.  6:08-ap-00145-KSJ |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | | |
| ROBERT N. GILBERT, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 6:10-ap-00151-KSJ |
| | ) | |
| RICHARD GOBLE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Defendant, Richard Goble, indirectly owned and actively managed North American Clearing, Inc. ("NACI") prior to May 2008.  NACI, for literally years, directly paid Goble's monthly credit card and other miscellaneous bills, which included both personal and business expenses.  Plaintiff[1] now contends that NACI's payments totaling approximately $527,000[2] are

---

[1] The Trustee was appointed pursuant the Securities Investor Protection Act of 1970, 11 U.S.C. § 78aaa *et seq.* (Doc. No. 1 at ¶ II, Main Case No. 6:08-ap-00145.)  The Trustee is "vested with the same powers and title" with respect to the Debtor as "a trustee in a case under title 11," including avoidance rights. 15 U.S.C. § 78fff-1(a).

[2] Plaintiff seeks to recover payments made between June 1, 2006 and  May 15, 2008.  The exact amount of the allegedly avoidable transfers is $527,979.19.  This number is $84.85 more than what the Trustee requests—the last charge identified in the Trustee's list of Transfers (Plaintiff's Exhibit 2) was not included in the Trustee's total. Nonetheless, the Court finds the Trustee intended to seek its avoidance and its omission was a calculation error.

avoidable fraudulent transfers.[3]  The Court concludes these payments are reimbursement for regular business expenses or part of Goble's normal compensation.  Plaintiff has established no basis to avoid the payments.

### NACI's Business

Goble, as the trustee of the Goble Family Trust which owns 100% of NACI, started the company in 2005.[4] NACI was a registered broker-dealer and clearing brokerage firm.  Clearing firms provide "back office" clearing services for other, smaller broker-dealers that are not equipped to perform the services in-house.[5]

NACI assisted 40 small brokerage firms and cleared trades for over 10,000 customer accounts.  These smaller broker-dealers work directly with the customers opening accounts and providing investment advice.  The clearing firm, such as NACI, then settles accounts, extends credit to customers with margin accounts, receives or delivers funds or securities from or to customers, maintains records reflecting the customers' monthly transactions, and produces periodic account statements to the customers.

NACI earned substantial fees from trades it settled for customers through the National Securities Clearing Corporation ("NSCC"), a national entity that provides clearing and

---

[3] The Amended Complaint (Doc. No. 46) asserts seven counts: (1) Constructive Fraud (Count I) under 11 U.S.C. § 548(a)(1)(B); (2) Actual Fraud (Count 2) under 11 U.S.C. § 548(a)(1)(A); (3) Actual Fraud (Count III) under § 726.105(1)(a) of the Florida Statutes; (4) Constructive Fraud (Count IV) under § 726.105(1)(b) of the Florida Statutes;  (5) Avoidance of the transfers  (Count V) under 11 U.S.C. § 550; (6) Breach of fiduciary duty (Count VI); and (7) Liability for unlawful distributions (Count VII) under § 607.0834 of the Florida Statutes.  The trial in this adversary proceeding lasted six days: March 11, 2013; March 12, 2013; July 8, 2013; July 9; 2013; October 28, 2013; and October 29, 2013.

[4] Prior to 2005, Goble together with another business partner operated a similar company called Empire Financial Holdings Corporation ("Empire Financial").  *See generally* Stock Purchase and Settlement Agreement, Ex. 10.15 to Plaintiff's Exhibit 50.

[5] *See* Henry F. Minnerop, *Clearing Arrangements,* 58 Bus. Law. 917, 918-19 (2003).

settlement services to broker-dealers.[6]    NACI would perform a daily "settlement" or reconciliation with NSCC keeping a running total of each customer's purchases, sales, and other trades throughout the business day.  Depending on the purchases versus sales, at the end of each day, NACI either would owe NSCC money or, vice versa, NSCC would pay NACI a rebate.

NACI also earned interest revenue on margin loans extended to its customers.  As customers purchased more stocks on margin, the amounts NACI owed NSCC at the end of each day correspondingly increased.  NACI used two main sources of cash to fund these margin trades and to meet its daily settlement obligations to NSCC.  First, NACI relied upon a large line of credit with US Bank that fluctuated between a few million dollars to as high as $17 million, depending on the value of the collateral NACI could pledge.[7] Second, NACI used customer funds to finance customers' margin trades.  Plaintiff challenges NACI's entitlement to use customer funds for this purpose.

NACI was consistently profitable.  The company earned $4,477,513 in revenue in 2006, although advance expenses accrued early for tax reasons resulted in a slight, artificial loss of $339,274.[8]  By 2007, NACI's revenue had increased to $5,340,493, and its net income improved

---

[6] The National Securities Clearing Corporation ("NSCC") is a subsidiary of the Depository Trust & Clearing Corporation ("DTCC"). NSCC is a registered clearing agency pursuant to Section 17A of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and "provides centralized clearance, settlement, and information services for virtually all broker-to-broker equity, corporate bond, municipal bond and other securities transactions in the United States." *Whistler Investments, Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1163 (9th Cir. 2008). A separate subsidiary of DTCC, the Depository Trust Company ("DTC"), "operates an automated, centralized system for book-entry transfers of securities positions among its participants, the beneficial owners of the securities, in accordance with their instructions." *Id.* In effect, DTC holds the physical securities for virtually all brokers nationally to facilitate changes of ownership.

[7] *See* Exhibit 22. When a customer purchases securities on margin, a broker-dealer is permitted to use a portion of the "purchased" securities as collateral to generate the cash required to finance the transaction for the customer. *See* 17 C.F.R. § 240.15c2-1(a) (regulating hypothecation and permitting hypothecation of customer securities up the amount of that customer's indebtedness). *See generally* Mariya Deryugina, *Standardization of Securities Regulation: Rehypothecation and Securities Commingling in the United States and the United Kingdom*, 29 Rev. Banking & Fin. L. 253, 267-68 (2009) (briefly explaining US hypothecation rules).

[8] Plaintiff's Exhibit 5, tab 3. Goble objected to the admission of the Plaintiff's Expert Report.  The Court overrules this objection and will admit Plaintiff's Exhibit 5.

to a positive $399,951.[9]  In 2008, NACI only operated from January through May but appeared poised for its most profitable year.  The firm earned $1,858,782.55 in total income and $382,095.39 in net income for the five-month operating period in 2008.[10]  Based on these figures, NACI hardly appears to have been on its last legs.  The firm's profitability was increasing year-to-year.

Goble was the person in charge of NACI, although he had no official title other than as a member of NACI's board of directors.[11] He made all important hiring decisions.  Bruce Blatman, NACI's last president, reported directly to Goble.[12]

Goble worked tirelessly to help NACI succeed focusing on marketing, technology, and generating business for the firm.  He routinely attended conferences around the country to promote NACI's services.  Goble was the salesman for the company and relied on others to insure that NACI complied with securities regulations and properly accounted for customer funds.[13]  According to Blatman, Goble "ran" NACI.[14]

Goble was well compensated for his work.  He received a base salary of between $140,000 and $150,000 per year plus medical costs and life insurance.  NACI also routinely paid his credit card bills in full every month.  The Court notes that Goble's prior employer, Empire Financial, paid Goble a much higher base salary of $345,000, also paid his credit card bills, and

---

[9] Plaintiff's Exhibit 5, tab 4.
[10] Defendant's Exhibit 13.
[11] Trial Tr. at 66-67, Mar. 11, 2013.
[12] *See* Trial Tr. at 64-66, Mar. 11, 2013; Trial Tr. at 737, Oct. 29, 2013.
[13] Starting in August 2007, Goble relied on Timothy Ward, NACI's Chief Financial Officer and Financial and Operations Principal to ensure NACI complied with all financial reporting requirements, most importantly, the daily Financial and Operation Combined Uniform Single ("FOCUS") reports.  Each FOCUS report contained a balance sheet, a computation of net capital requirements, a statement of income, and the computation of NACI's Rule 15c3-3 deposit requirement.  Due to irregularities with his completion of these reports, Goble fired Ward on May 21, 2008.
[14] Trial Tr. at 68, Mar. 11, 2013.

extended other benefits to Goble he did not receive at NACI.  The Court concludes that Goble's overall compensation was substantially better *before* he started NACI.[15]

NACI similarly compensated other members of senior management.  For example, NACI routinely paid President Blatman's credit card bills every month besides paying his base salary.  For other senior employees,[16] NACI paid all or a certain amount of their credit card bills per month, e.g., $5,000 per month.

NACI's accounting staff consistently reviewed every employee's credit card bill to separate reimbursed business expenses from personal expenses.  Ward, NACI's Chief Financial Officer, personally would comb through the statements to determine which expenses constituted business charges benefitting NACI and which were personal.  The company reflected business expenses on its own financial records.  For personal expenses paid by NACI, the company's financial records reported income earned by the employee.  NACI properly reimbursed business expenses[17] and treated the other charges as compensation to the employee.

On May 27, 2008, the Securities and Exchange Commission ("SEC") filed an enforcement action to shut down NACI's operations due to concerns about the accuracy of their daily settlement practices.[18]  The SEC alleged that Ward, at Goble's direction and on a single occasion, falsified NACI's books to allow the firm to withdraw money out of an account held for

---

[15] Defendant's Exhibit 76 at 3.

[16] Wendy Epps and John Busacca were other members of NACI's senior management for whom NACI paid their monthly personal credit card bills in whole or in part.

[17] The Court uses the term "business expenses" not in the tax sense, but to connote expenses that conferred a benefit on NACI rather than solely a personal benefit to Goble.

[18] *Securities and Exchange Commission v. North American Clearing, Inc., et al.*, Case No 6:08-cv-00829-MSS-KRS, filed in the United States District Court for the Middle District of Florida.

the benefit of its customers.[19]  Regulators caught the irregularity, and NACI immediately repaid the money it withdrew.  But, because NACI could not meet certain regulatory requirements without that money, regulators and certain NACI officers elected to wind down the firm, prompting the Securities Investor Protection Corporation ("SIPC") to start liquidation proceedings.[20]

At the request of the SIPC, the District Court appointed Robert N. Gilbert as Trustee on July 28, 2008.  The appointment of the Trustee started NACI's liquidation process and caused the removal of the dispute to this Court under the Securities Investor Protection Act.[21]  On May 26, 2010, the Trustee filed this fraudulent transfer adversary proceeding against Goble seeking to avoid 102 transfers from NACI to Goble of $527,979.19, made between June 1, 2006 and May 15, 2008 (the "Transfers").[22]

### The Transfers

The Transfers[23] divide neatly into categories:

***Four Year Transfers***:  Nine Transfers, totaling $26,031.26, were made over two years prior to the petition date.[24]

---

[19] The SEC also alleged, and ultimately proved, that NACI's actions violated the Customer Protection Rule (17 C.F.R. § 240.15c3–3) and the books and records requirements of the Securities Exchange Act of 1934 (17 C.F.R. § 240.17a–3) and that Goble aided and abetted NACI's violations. *Securities and Exchange Comm'n v. North American Clearing, Inc., et al.*, Case No 6:08-cv-00829-MSS-KRS (M.D. Fla. Feb. 27, 2011), *rev'd on other grounds*, *Securities and Exchange Comm'n v. Goble*, 682 F.3d 934 (11th Cir. 2012).

[20] Goble maintains that NACI could have met its regulatory requirements, but again, these events have virtually no bearing on the issues before this Court.

[21] Main Case No. 6:08-ap-00145-KSJ, Doc. No. 1. The Securities Investor Protection Act refers to 15 U.S.C. § 78aaa *et seq.*

[22] Plaintiff's Exhibit 2.

[23] A summary categorizing the Transfers is provided at Attachment A to this Memorandum Opinion.

[24] The Court finds that the "petition date" is July 28, 2008, the date the District Court entered its order appointing the Trustee and removing the SIPA liquidation proceeding to the Bankruptcy Court.  Doc. No. 46 at Paragraph 3 in this Adversary Proceeding 10-151 and Doc. No. 1 in Main Case No.6:08-ap-145-KSJ. 15 U.S.C. U.S.C. 78lll(7).  The nine Four Year Transfers occurred between June 1 and July 14, 2006.

*__Two Year Transfers__*: The balance of the Transfers, totaling $500,947.93, were made between July 28, 2006 and May 15, 2008.  These Two Year Transfers also divide into sub-categories:

> *__NACI Payments for Business Expenses ($255,282.06)__*: NACI paid $238,628.17 to Bank of America for business expenses charged by Goble on his personal credit card and an additional $16,653.89, to other vendors for miscellaneous business expenses.[25]  NACI reflected these items as its own business expenses in its accounting records and directly paid the BOA credit card and the other vendors.

> *__NACI Payments for Goble's Personal Expense ($245,777.72)__*.  NACI paid $232,739.35 to Bank of America for personal expenses charged by Goble on his personal credit card and an additional approximately $13,038.37 to other vendors or to Goble directly for other personal expenses of Goble.[26]

**Trustee Cannot Recover the Four Year Transfers (Counts III and IV)**

Plaintiff seeks to avoid the Four Year Transfers, those made earlier than July 26, 2006 and totaling $26,031.26, as actually and constructively fraudulent under Fla. Stat. § 726.105(1)(a) and (b), relying on the avoidance powers granted by § 544(b) of the Bankruptcy Code.[27]  Although the state law fraudulent transfer provisions are similar to the fraudulent

---

[25] NACI paid vendors directly for business expenses totaling $16,653.89 for (1) Goble and other NACI employee's cell phone bills ($9,183.96); (2) 2006 Real Estate Taxes on the real estate owned by the Goble Family Trust but used by NACI for its offices ($7,135.08); (3) a Direct TV bill ($84.85); and (4) a taxi charge incurred on a NACI business trip ($250).  Goble testified that NACI did not pay rent on its office space but did pay the real property taxes and other property-related expenses.

[26] The non-credit card personal expenses paid by NACI and for the benefit of Goble include: (1) $2,805 for a life insurance policy; (2) $4,662.74 for medical reimbursement; (3) $104.20 for an auto license/tag renewal fee; and (4) $1,546.74 for legal fees in pending litigation involving Goble.  The other personal charges ($3,919.69) are unexplained but are assumed to be personal costs paid by NACI at Goble's direction.

[27] 11 U.S.C. Section 101 *et seq*., referenced in this Memorandum Opinion as the "Bankruptcy Code."

transfer provisions of Section 548 of the Bankruptcy Code "in form and substance,"[28] one material difference exists—state law has a more favorable four-year look-back period versus a two-year look back period allowed under bankruptcy law.[29] Therefore, Transfers made over two years prior to the petition date, here July 28, 2008, are only avoidable under Florida state law and not under bankruptcy law.

To assert these state law fraudulent transfer claims, the Trustee must rely on § 544(b) of the Bankruptcy Code that requires the Trustee to prove "the existence of at least one unsecured creditor of the Debtor who at the time the transfer in question occurred could have, under applicable local law, attacked and set aside the transfer under consideration."[30] The Trustee made no attempt to allege, much less prove, the existence of such a creditor. Without any further analysis, the Trustee has established no basis to rely on his strong arm powers of Section 544(b) or to establish a claim to avoid the Four Year Transfers. The Trustee's state law fraudulent transfer claims asserted in Counts III and IV fail.

## Trustee Cannot Avoid the Two Year Transfers as Constructively Fraudulent (Count I)

Turning to the transfers made within two years of July 28, 2008 and totaling $500,947.93, Section 548(a)(1)(B) of the Bankruptcy Code allows the Trustee to avoid any transfer made by NACI within two years before the petition date if the Trustee proves two elements by a preponderance of the evidence.[31] First, the Trustee must show that NACI received less than

---

[28] *In re Stewart*, 280 B.R. 268, 273 (Bankr. M.D. Fla. 2001). *See also In re Toy King Distributors, Inc.*, 256 B.R. 1, 126-27 (Bankr. M.D. Fla. 2000).

[29] *Compare* 11 U.S.C. § 548(a)(1) (providing for two-year look-back period) *with* Fla. Stat. § 726.110 (2014) (providing for four-year look-back period). *See also In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 848-49 (Bankr. M.D. Fla. 2005).

[30] *In re Smith*, 120 B.R. 588, 590 (Bankr. M.D. Fla. 1990).

[31] *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 252 (Bankr. M.D. Fla. 2003). *See also In re Jackson*, 459 F.3d 117, 122-23 (1st Cir. 2006) (explaining why preponderance of evidence is the appropriate standard of proof in constructive fraud actions). Trustee bears the burden of proof on all issues. *Henkel v. Green (In re Green)*, 268 B.R. 628, 650 (Bankr. M.D. Fla. 2001) (citing *General Electric Credit Corp. of Tenn. V. Murphy (In re Rodriguez)*, 895 F.2d 725, 726 n.1 (11th Cir. 1990)).

reasonably equivalent value for the Two Year Transfers.  Second, the Trustee must prove that NACI was in financial distress at the time of the challenged transfers.  The Trustee may show this financial instability proving that NACI (1) was insolvent, (2) had unreasonably small capital at the time of the Transfers, or (3) intended to incur debts beyond its ability to pay such debts as they matured.[32]  The Trustee here argued that NACI had unreasonably small capital at the time of the Transfers, tacitly conceding that NACI was solvent and was not on the cusp of incurring unusual debt when the two Year Transfers occurred.  The Court now will analyze whether NACI received reasonably equivalent value for the Two Year Transfers and whether NACI was undercapitalized.

### NACI Received Reasonably Equivalent Value

Trustee first must prove that NACI did not receive reasonably equivalent value for the Two Year Transfers.  "The burden of proving lack of 'reasonably equivalent value' under [11 U.S.C. § 548(a)(1)(B)(i)] rests on the trustee challenging the transfer."[33]  Further, the trial court has broad discretion to decide the factual question of whether sufficient value was given.[34]  "[R]easonably equivalent value does not demand a precise 'dollar-for-dollar' exchange."[35]  The Eleventh Circuit Court of Appeals explored the contours of § 548(a)(1)(A)'s "reasonably equivalent value" in *In re Rodriguez*,[36] opining:

> The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's estate. . . . Therefore, this provision does not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly. . . . In such a situation, "the

---

[32] 11 U.S.C. § 548(a)(1)(B); *In re International Management Assoc.*, 399 F.3d 1288, 1292 (11th Cir. 2005).
[33] *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593-94 (11th Cir. 1990).
[34] *Id.* (citing *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829-30 (5th Cir.1959) (Wisdom, J.), *cert. denied*, 362 U.S. 962, 80 S. Ct. 878, 4 L. Ed. 2d 877 (1960)).
[35] *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 490 F.3d 1325, 1336 (11th Cir. 2007).
[36] *General Electric Credit Corp. of Tenn. v. Murphy (In re Rodriguez)*, 895 F.2d 725 (11th Cir. 1990).

debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer.[37]

Here, the Two Year Transfers fall into two categories—business expenses ($255,282.06) and personal expenses ($245,777.72).  The business expenses include charges for these types of expenditures:

- Travel expenses for Goble and other employees to attend business meetings and trade conferences;
- Real estate taxes and property related expenses on NACI's offices;
- Advertising expenses;
- Business cell phone costs;
- Stockbroker test preparation materials;
- Employee search firm services;
- Computer equipment;
- Business lunches for NACI employees and others;
- Office supplies;
- Company gatherings and other outings for employees;
- FINRA charges;
- Corporate filing expenses;
- Software licensing expenses; and
- Conference call services.[38]

After trial, the Court reviewed these expenses at some length and honestly is shocked that the Trustee would challenge these expenses. Trustee put forth absolutely NO proof to show that NACI failed to receive reasonably equivalent value from these charges. Many of the credit card charges are clearly business related, such as amounts paid to FINRA, employee search firm services, corporate filing expenses, and conference call services. To argue that NACI received *no* value from these obviously business-related Transfers defies logic.

Goble, on the other hand, made a significant effort to divide NACI's payments into the two categories—business and personal.  The Court accepts Goble's testimony as both the best evidence and the most credible in dividing the expenses between personal and business as listed

---

[37] *Id.* at 727 (citations omitted).
[38] Plaintiff's Exhibit 6.

NACI 10-ap-00151 North American Clearing v Goble - Memorandum Opinion -FINAL/ / Revised: 9/30/2014 10:23:00 AM
Page: 10 of 25

Printed: 9/30/2014

in his Interrogatory Answers.[39]    In the end, the Court could not allocate only a *de minimus* amount of $111.85 as either business or personal expenses.

For those charges where the business-related nature of the expenses was not readily apparent, Goble's extremely credible testimony was particularly helpful in dividing business from personal expenses. Examples include charges for computers and equipment for NACI offices, lunches for employees, and sporting event tickets. The Court also was persuaded that Goble testimony demonstrated a methodical and thorough review when he divided the charges into personal versus business categories, perhaps to his disadvantage. Goble's testimony moreover was corroborated in concept if not in detail by the testimony of two other former NACI employees, Aimee Johnson and Joshua Carol.[40]

The Court finds that the Trustee made no real effort to analyze the transfers other than to posit that *any* payment to Goble, regardless of the reason, was of no or value to NACI.  The Trustee's accounting professionals simply searched NACI's accounting records for every single payment to Goble.[41] The list of disbursements identified on Plaintiff's Exhibit 2 is an unaltered and unanalyzed print-out from NACI's accounting software.  The Trustee's professionals did no further review or analysis into any of the disbursements. Every payment to Goble, or any made on his behalf, was included in the Trustee's list of Transfers.

The Trustee's professionals apparently discounted NACI's Chief Financial Officer, Mr. Ward's, division of the expenses into business and personal categories.  Ward testified that month after month he reviewed every credit card statement, line-by-line, to determine whether the entries were personal or business-related.[42]  When the Trustee initially filed NACI's 2007

---

[39] Plaintiff's Exhibit 6.
[40] Trial Tr. at 317-27, July 9 2013; Trial Tr. at 598-599, October 28, 2013.
[41] Trial Tr. at 203, July 9, 2013.
[42] Trial Tr. at 221-22, March 12, 2013.

federal tax return, he relied on NACI's accounting records, which included Ward's business expense designations.[43] The Trustee later amended these tax returns[44] and treated all of the expenses as personal income to Goble.  Not only did this amendment surreptitiously coincide with the Trustee's complaint against Goble, it also resulted in substantial individual tax liability for Goble. The Trustee decided to eliminate NACI's business expense delineation without making any underlying investigation into the credit card statements, asking Goble for further information, or trying to gather supporting receipts, likely held in NACI's files.[45]

The Court accepts Goble's analysis in full and finds that the business expenses, as categorized by him, for $255,282.06 reimbursed him for NACI's valid business expenses and provided at least reasonably equivalent value to the company.   They are not avoidable as constructively fraudulent transfers.

On the remaining transfers totaling $245,777.72, Goble concedes, against his best interest, these were personal expenses paid by NACI either to him or other vendors.  The Court concludes these amounts constitute income paid by NACI to Goble and were part of his normal compensation package. The issue is whether Goble's work for NACI supplied "reasonably equivalent value" for the payment of this compensation.

NACI (and previously Empire Financial) *always* paid Goble's entire credit card bill, regardless of which expenses NACI flagged as personal or business. Ward testified that the

---

[43] Defendant's Exhibit 58.

[44] Defendant's Exhibit 43.

[45] "The fact that [a defendant] failed to keep more specific books and records is not enough, standing alone, for the Trustee to avoid . . . transfers." *In re E.D.B. Constr. Corp.*, 11-76129-REG, 2013 WL 6183849 (Bankr. E.D.N.Y. Nov. 26, 2013). NACI's lack of adequate records, even if true, does not satisfy the Trustee's burden to prove the business expense reimbursements did not provide reasonable equivalent value to NACI, particularly when so many of the expenses facially appear to be routine type business expenses. Goble maintains that NACI did keep receipts of business expenses, but that the Trustee either destroyed or lost them.  *See* Document Nos. 148, 149, 177, 181, 182, and 201.

practice occurred for "long before" he became a NACI employee.[46] The payments for Goble's credit cards were a regular part of NACI's account payables system.[47] From NACI's perspective, part of Goble's normal monthly compensation included payment of his monthly credit card bills and a few other miscellaneous payments.

NACI similarly paid the monthly credit card bills of other NACI executives, such as Blatman, Busacca, a former Chief Executive Officer of NACI, and Epps, NACI's Chief Operations Officer.[48] NACI's payment of other executives' credit card bills, not just Goble's, demonstrates that NACI's payment of Goble's personal expenses accurately are treated as compensation paid to him.

Goble's compensation at NACI, including NACI's payment of his personal expenses, was reasonable. Goble earned a base salary of $140,000 to $150,000 per year. Averaging the approximately $240,000 in personal expenses/compensation paid to Goble over the 24 month look-back period, the charges amount to roughly $120,000 per year, resulting in a total annual compensation of $270,000, a reasonable sum for the person running a company of the size and complexity of NACI.

Goble's compensation at Empire Financial, his prior employer, was substantially higher—a $345,000 base salary *plus* the payment of his monthly credit card bills, which if extrapolated from his time at NACI, would equal an additional $120,000 per year for total annual compensation of $465,000. Goble earned almost $200,000 less per year at NACI than at his prior business.

---

[46] Trial Tr. at 219, March 12, 2013.
[47] Trial Tr. at 219, March 12, 2013.
[48] Trial Tr. at 254, March 12, 2013.

NACI 10-ap-00151 North American Clearing v Goble - Memorandum Opinion -FINAL / / Revised: 9/30/2014 10:23:00 AM
Page: 13 of 25

Printed: 9/30/2014

The debtor's principal in *In re Seaway International Transport, Inc.*,[49] was in a similar situation. The debtor there directly paid the defendant's mortgage payments on his home. The trustee sought to avoid the mortgage payments as constructive fraudulent transfers, but the court held that the mortgage payments served as a pattern of compensation that benefitted the debtor.[50] The debtor paid the defendant's mortgage directly as a matter of convenience, instead of paying the principal a salary and the principal then paying the mortgage.[51] NACI here could have easily paid Goble a higher salary and Goble then could have paid his credit card and other bills. But for convenience or from long-standing pattern, NACI instead directly paid Goble's credit card bills and a few other insignificant personal expenses.

The Trustee did not prove that Goble's compensation was excessive or that NACI did not receive reasonably equivalent value for the total compensation Goble received. "[P]ayments of salary are presumed to be made for fair consideration, and in order for a trustee to avoid them he must establish that the salary payments were in bad faith or the payments were excessive in light of the Defendants' employment responsibilities."[52]

Goble had significant responsibility at NACI. He served on the board of directors. Goble also was in charge of NACI's marketing efforts, made all major hiring decisions, and was the official spokesperson for NACI in the securities community. All testimony by former employees of NACI confirmed that Goble "ran" the company and worked tirelessly to help the company flourish. He earned his salary of approximately $270,000 per year. NACI received at least

---

[49] 341 B.R. 333 (Bankr. S.D. Fla. 2006).

[50] *Seaway Int'l*, 341 B.R. at 336.

[51] *Id.* at 335-36. In *Seaway*, the posture was slightly different. There, the trustee sought to recover from the *initial transferee*, the mortgage holder, not the beneficiary of the transfers. In this case, the Trustee seeks to recover from Goble himself, as the beneficiary of the transfers, not the credit card issuer.

[52] *In re TC Liquidations LLC*, 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011). *See also Cilco Cement Corp. v. White*, 55 A.D.2d 668, 668, 390 N.Y.S.2d 178 (N.Y. App. Div. 1976) (holding that the salary paid to the president of the company was not a fraudulent conveyance because there was "no evidence that his salary was either excessive or unreasonable, or that the corporation did not receive full value in return").

reasonably equivalent value for the Goble's personal services, including the payment of his personal expenses and credit card bills.

The Trustee has failed to prove an essential element to avoid the Transfers as constructively fraudulent as asserted in Count I.  The Court specifically finds that NACI received reasonably equivalent value from both the reimbursement of the business expenses and the payment of Goble's personal expenses.

### The Trustee Also Failed to Prove NACI had Unreasonably Small Capital

Ignoring the Trustee's failure to meet the first element to establish a constructively fraudulent transfer, i.e., the less than reasonably equivalent value prong, the Trustee also must prove the second element required by § 548(a)(1)(B)(ii) of the Bankruptcy Code—that NACI was in some serious financial distress when the alleged avoidable transfers were made.  Here, the Trustee tried to establish this element by showing that the Debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital."[53]  This prong is known as "unreasonably small capital" or "undercapitalization,"[54] is rarely argued, and is difficult to establish.  Indeed, the vast majority of the six days of trial time was devoted to this portion of the Trustee's complicated factual argument.

The concept of unreasonably small capital is distinct from balance sheet insolvency and equitable insolvency.[55]  Although not defined in the Bankruptcy Code, the most common view is that "unreasonably small capital denotes a financial condition short of equitable insolvency."[56]

---

[53] 11 U.S.C. § 548(a)(1)(B)(ii)(II).
[54] The Trustee's post-trial brief mentions briefly "inability to pay debts as they become due," but the Trustee put forth no evidence that NACI was unable to pay its debts as they become due or otherwise establish insolvency.
[55] *See Moody v. Security Pacific Business Credit Inc.,* 971 F.2d 1056, 1069-70 (3d Cir.1992); *In re Vadnis Lumber Supply, Inc.,* 100 B.R. 127, 137 (Bankr. D. Mass. 1989).
[56] *Moody,* 971 F.2d at 1070.

Put differently, "[u]nreasonably small capitalization . . . encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future."[57] "The unreasonably small capital test of financial condition is aimed at transferees that leave the transferor technically solvent but doomed to fail."[58] One court defined "unreasonably small capital" as "having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable."[59]

"Whether a transfer or obligation leaves a debtor undercapitalized is a question of fact to be determined on a case-by-case basis."[60] The unreasonably small capital test "analyzes whether *at the time of the transfer* the company had insufficient capital, including access to credit, for operations."[61] In weighing the evidence of unreasonably small capital, a court must "'examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable' after a transfer."[62] "Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse."[63] An analysis of unreasonably small capital cannot suffer from "hindsight bias."[64]  In evaluating whether a transfer leaves a debtor with unreasonably small capital, a court typically "is called upon to review a debtor's historic and contemporaneous business activities, the ebb and flow of income and expense over time, the availability of

---

[57] *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989).

[58] *In re Kane & Kane*, Adv. No. 10-01022-EPK, 2013 WL 1197609, at *9 (Bankr. S.D. Fla. Mar. 25, 2013) (citing *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009)).

[59] *United States v. Menotte*, 484 B.R. 835, 840 (S.D. Fla. 2012), *aff'd sub nom.*, *In re Custom Contractors, LLC*, 745 F.3d 1342 (11th Cir. 2014).

[60] *Kane & Kane*, 2013 WL 1197609, at *9.

[61] *In re EBCI, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008) (citing *Moody*, 971 F.2d at 1073) (emphasis added).

[62] *In re Jackson*, 459 F.3d 117, 123 (1st Cir. 2006) (quoting *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992)).

[63] *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 795 (7th Cir. 2009).

[64] *Id.*

additional capital or lines of credit, the prospect for new business, and a variety of inter-related issues that affect whether the enterprise will continue."[65]

The Trustee here provided no meaningful analysis of the Debtor's financial condition in conjunction with the Transfers. The Trustee's case hinged instead on questionable legal presuppositions and untested hypotheses involving NACI's use of customer funds in its operations.  In simple terms, the Trustee argues that NACI improperly used customer cash to fund daily operating expenses and, therefore, must have been operating with unreasonably small capital when the Transfers occurred.  The Court rejects this argument in whole making the following summary conclusions:

(1) NACI regularly transferred customer monies between NACI's money market accounts and NACI's operating account through "manual redemptions."

NACI regularly converted customers' stagnant cash account balances to money market investments.  This allowed NACI to avoid paying customers interest on their cash balances because they instead would receive interest from the money market investment.  But this required NACI to convert the customer's investment back into its original cash position when the customer wanted to make a purchase or receive a check or wire.  NACI also "manually redeemed" customer's money market position back into original cash positions if it needed funds for legitimate purposes.[66]

(2) The manual redemptions were proper uses of customer monies.

Contrary to the Trustee's position, broker-dealers are permitted to use customer funds in

---

[65] *Kane & Kane*, 2013 WL 1197609.
[66] The largest payments NACI made from its US Bank operating account were for its daily settlement costs with NSCC, payments on its US Bank loan, and transfers to its EBOC account for Rule 15c3-3 purposes.

certain aspects of their business related to servicing their securities customers.[67]  Commingling

of customer funds with a broker's cash reserves is commonplace within the securities brokerage

industry.[68]  "[W]hen [customers of broker-dealers] leave free credit balances with a broker-

dealer the funds generally are not segregated and held for the customer, but are commingled with

other assets of the broker-dealer and used in the operation of the business."[69]

One of the most accepted uses of customer funds within by a broker dealer is funding

customers' margin purchases.[70]  Goble vociferously testified that the reason NACI manually

redeemed customer money market accounts was to fund customer margin purchases – i.e., loan

customers money to allow them to purchase securities while charging interest on the money

loaned.[71]  NACI's account statement contained more than adequate disclosures to customers to

---

[67] The aim of Rule 15c3-3 was to "give more specific protection to customer funds and securities, in effect forbidding brokers and dealers from using customer assets to finance any part of their businesses *unrelated to servicing securities customers*; e.g., a firm is virtually precluded from using customer funds to buy securities for its own account."  Net Capital Requirements for Brokers and Dealers, Exchange Act Release No. 21651 (Jan. 11, 1985), *available at* 1985 WL 634777, *2.

[68] *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 701 (2d Cir. 1998) ("Customer accounts with brokers are generally not segregated, *e.g.*, in trust accounts.  Rather, they are part of the general cash reserves of the broker.").

[69] *Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 220 (2d Cir. 2012) (quoting *Adoption of Rule 15c3-2 Under the Security Exchange Act of 1934*, Exchange Act Release No. 34-7325, 1964 WL 68010, at *1 (164)).

[70] Outside of the EBOC deposit requirement, "the broker-dealer can use customer cash to facilitate customer transactions such as financing customer margin loans and borrowing securities to make deliveries of securities that customers have sold short."  Financial Responsibility Rules for Broker-Dealers, 78 Fed. Reg. 51824-01, 51827 (Aug. 21, 2013).

[71] Trial Tr. At 588-90, Oct. 29, 2013. Multiple NACI employees also testified that NACI engaged in the manual redemptions to meet its daily settlement requirements with NSCC.  (*E.g.*, Trial Tr. At 485, Oct. 28, 2013).  NACI's settlement payments to NSCC included financed margin transactions for customers.  If a customer used its own money to fully pay for a securities purchase, then NACI would send those funds money to NSCC to settle the trade. However, if a customer made a trade on margin, NACI would need to come up with the funds to loan the customer and then send those funds to NSCC as settlement.  Thus, when NACI's margin trades increased, it needed to borrow money to send NSCC on behalf of the customer.

comply with securities rules.[72]  The Trustee failed to prove that NACI used customer funds for improper purposes.

> (3) NACI's manual redemptions did not violate 17 C.F.R. 15c3-3's obligation for NACI to compute an accurate weekly reserve deposit requirement.

The Trustee also did not prove that NACI ever failed to accurately perform its weekly reserve computation required by 17 C.F.R. § 240.15c3-3, other than the one error that resulted in the closure of NAC.  "Rule 15c3-3 requires the maintenance of reserves of customer property to ensure full recovery for its customers in the event of its liquidation."[73]  Rule 15c3-3(e) requires broker-dealers such as NACI to perform a weekly reserve computation, through which the broker-dealer determines the amount it must deposit into a reserve bank account for its customer's benefit.[74]  NACI here properly computed its weekly reserve requirement and presumably made its weekly deposit as required by the rule.

> (4) The Trustee established no correlation in time between the manual redemptions, which rarely commenced until later in 2007, and NACI's need to use customer funds to pay the Transfers, which started as early as May 1, 2006.

---

[72] 17 C.F.R. § 240.15c3-2 specifically allows broker-dealers to commingle and to use customer free credits in permissible areas of its business.  Rule 15c3-2 requires a broker-dealer to provide its customers with a statement of amount due the customer at least once every three months, which included a notice that (1) the customer's free credits were not being segregated, but were being used in the broker-dealer's business, and (2) the funds are payable on demand.  Financial Responsibility Rules for Broker-Dealers, 78 Fed. Reg. 51824-01, 51836-37 (Aug. 21, 2013).  NACI's customer account statements contained the language required by Rule 15c302, which was effective during the time periods relevant to this case, between 2006 and 2008 (Rule 15c3-2 since has been wrapped up into Rule 15c3-3).  NACI's Account Statements contained the following provision in accordance with Rule 15c3-2: 4. Free Credit Balances:  Any free credit balance represents funds which may or may not be segregated and which may or may not be used in the conduct of this firm's business; such funds are payable to you upon demand. (Defendant's Exhibit 41.)

[73] *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 191-92 (Bankr. S.D.N.Y. 2011), *aff'd in part, rev'd in part sub nom, In re Lehman Bros. Inc.*, 473 B.R. 34 (S.D.N.Y. 2012) *opinion amended and superseded*, 478 B.R. 570 (S.D.N.Y. 2012) and *aff'd in part, rev'd in part sub nom. In re Lehman Bros. Inc.*, 478 B.R. 570 (S.D.N.Y. 2012).

[74] 17 C.F.R. § 240.15c3-3(e).  The reserve deposit requirement is computed according to a complicated formula set out in Rule 15c3-3a.  17 C.F.R. § 240.15c3-3a.  Generally speaking, the deposit requirement equals the excess of "customer credits" over "customer debits," as defined in Rule 15c3-3a.  *Upton v. S.E.C.*, 75 F.3d 92, 93 (2d Cir. 1996).  *See also* 17 C.F.R. § 240.15c3-3a (categorizing customer credits versus customer debits).  Cash sitting in a customer account would be considered a credit, and thus a liability of NACI, but a margin loan to a customer would be a customer debit, meaning the customer owes NACI money.  Depending on NACI's customer credits in excess of customer debits, NACI was required to either deposit funds into the EBOC account or could be entitled to withdraw funds from the EBOC account if the account's beginning balance exceeded the deposit requirement determined by the Rule 15c3-3 calculation.  *See* 17 C.F.R. § 240.15c3-3(e)(3)(i).

The Transfers occurred regularly over a two-and-a-half year period starting on June 1, 2006. The manual redemptions, challenged by the Trustee, did not start in earnest until late 2007. "Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse.[75] In order to show that NACI had unreasonably small capital, the Trustee must show that these conditions existed when each of the transfers were made, starting 18 months earlier.

The Trustee wholly failed to prove that after *each transfer*, the capital remaining with NACI was unreasonably small. The Trustee's analysis of NACI's cash flow from the reserve money market fund only focused on ten days over the entire two-and-a-half year period.[76] The Trustee did not explain his methodology for identifying these ten days. It appears he may have focused inordinately on dates when NACI was especially strapped for cash. Even if the Court did agree that the manual redemptions proved that NACI was undercapitalized on that date, which the Court does not, the Trustee did not look at a large enough picture to warrant setting aside over two years of regularly occurring payments.[77]

The Trustee simply failed to prove that NACI operated with unreasonably small capital when the Transfers were made. "The unreasonably small capital test of financial condition is

---

[75] *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 795 (7th Cir. 2009).

[76] One of these days, June 2, 2006, was outside the two-year look back period. (Plaintiff's Exhibit 8.) Two more of the total ten days analyzed were in September of 2006. (Plaintiff's Exhibits 9-10.) Three more of these days were concentrated within a one-week period in May and June 2007. (Plaintiff's Exhibits 11-13.) Two of the days were within two weeks of each other in April 2008. (Plaintiff's Exhibits 16-17.)

[77] Moreover, because the Trustee's argument rests on the proposition that NACI *needed* to use an allegedly improper source of cash to stay afloat, the availability of other avenues of cash would refute his argument. The unreasonably small capital test "analyzes whether at the time of the transfer the company had insufficient capital, *including access to credit*, for operations." *In re EBC I, Inc.*, 380 B.R. 348,359 (Bankr. D. Del. 2008) (citing *Moody*, 971 F.2d at 1073) (emphasis added). The Trustee's exhibit analyzing NACI's line of credit with US Bank shows that NACI regularly had credit available on the US Bank loan. (Plaintiff's Exhibit 22.) Admittedly, NACI's line of credit with US Bank was strained during mid-2007—from late May 2007 through mid-July 2007—when NACI lost two large customers. But, "While a company must be adequately capitalized, it does not need resources sufficient 'to withstand any and all setbacks.'" *Kipperman v. Onex Corp.*, 411 B.R. 805, 806 (N.D. Ga. 2009) (citing *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co*., 910 F. Supp. 913, 943 (S.D.N.Y. 1995)). Availability on NACI's US Bank line of credit also weighs against any finding of unreasonable small capital.

aimed at transferees that leave the transferor technically solvent but doomed to fail."[78] "Unreasonably small capital" is "having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable."[79] Contrary to the picture painted by the Trustee, NACI was not on its last legs when the Transfers were made.

NACI instead satisfied industry regulatory requirements for capitalization imposed by the Net Capital Rule.[80] Rule 15c3-1, the "Net Capital Rule," requires broker-dealers to maintain a certain level of capital reserves.[81] Goble's expert, Michael Brown,[82] testified that NACI complied with the Net Capital Rule's requirements at all times and never had to issue an "early warning report," a report required by the SEC when a broker-dealer's net capital slips below a certain range.[83] Further, Mr. Brown testified that, based on his expertise in the securities business, the Rule 15c3-1 requirement is more arduous than capital requirements in other industries.[84] Based on Mr. Brown's review, NACI never fell below the net capital level required by Rule 15c3-1.

---

[78] *In re Kane & Kane*, Adv. No. 10-01022-EPK, 2013 WL 1197609, at *9 (Bankr. S.D. Fla. Mar. 25, 2013) (citing *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009)).

[79] *United States v. Menotte*, 484 B.R. 835, 840 (S.D. Fla. 2012), *aff'd sub nom.*, *In re Custom Contractors, LLC*, 745 F.3d 1342 (11th Cir. 2014).

[80] The unreasonably small capital test "analyzes whether *at the time of the transfer* the company had insufficient capital, including access to credit, for operations." *In re EBCI, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008) (citing *Moody*, 971 F.2d at 1073) (emphasis added). Courts "'examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable' after a transfer." *In re Jackson*, 459 F.3d 117, 123 (1st Cir. 2006) (quoting *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992)). "Rule 15c3-1 defines the Net Capital Rule, prescribing a test that ensures registered broker-dealers have adequate liquid assets to meet their obligations to their investors and creditors." David A. Kessler, *Investor Casualties in the War for Market Efficiency*, 9 Admin. L.J. Am. U. 1307, 1343 (1996). The purpose of the rule certainly seems in line with an unreasonably small capital inquiry.

[81] 17 C.F.R. § 240.15c3–1. *In re EBCI, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008) (citing *Moody*, 971 F.2d at 1073) (emphasis added).

[82] The Court declines to admit the report of Mr. Goble's other expert, Anthony Ruben, or this report. (Defendant's Exhibit 163.)

[83] Trial Tr. at 654, Oct. 29, 2013.

[84] Trial Tr. at 652-54, Oct. 29, 2013.

NACI also operated at a profit in 2007, and appeared poised for a very profitable year in 2008.[85] Aside from the Trustee's manual redemption argument, which the Court does not accept, no evidence showed that NACI ever missed payments to creditors or that NACI was in financial distress or "just short of equitable insolvency" throughout the two plus years the Transfers occurred. At the time of the Transfers, NACI's bankruptcy never seemed "likely and foreseeable."[86] In April 2008, NACI reported $889,501 in revenue and $175,549 in profit the very month before it was taken over by the SIPC.[87]

The events of May 2008, which led to SIPC's intervention, were unrelated to whether NACI was properly capitalized in June 2006 or at any point during the next 24 months when the Transfers occurred. As Judge Easterbrook of the Seventh Circuit Court of Appeals aptly noted, "[o]ne is tempted to suppose that because a firm failed it must have been inadequately capitalized. That temptation must be resisted."[88] The Trustee has failed to prove that NACI had unreasonably small capital when the Transfers were made. Count I fails.

### No Actual Fraudulent Transfers Occurred (Counts II and V)

Although the Trustee's case mainly focuses on avoiding the Transfers as constructively fraudulent, the Trustee also argues actual fraud occurred. To avoid the Transfers as actually fraudulent, the Trustee must prove: 1) the Debtor transferred an interest in property, and 2) the transfer was made with the actual intent to hinder, delay or defraud creditors.[89]

Here, the Debtor transferred monies to Goble and other vendors at his direction. The issue is whether NACI made the Transfers with the intent to "hinder, delay, or defraud

---

[85] Plaintiff's Exhibit 5, tab 4; Defendant's Exhibit 13.
[86] *Menotte*, 484 B.R. at 840.
[87] Defendant's Exhibit 45. Not many of the FOCUS reports were submitted into evidence, and those that were often were incomplete. *See* Defendant's Exhibits 103 (September 2006); 54 (November 2006); 102 (December 2006); 101 (May 2007); 100 (June 2007); 99 (February 2008); and 45 (April 2008).
[88] *Boyer v. Crown Stock Dist., Inc.*, 587 F.3d 787, 794 (7th Cir. 2009).
[89] *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 252 (Bankr. M.D. Fla. 2003); *see In re Harwell*, 628 F.3d 1312, 1317 (11th Cir. 2010).

creditors."  Fraudulent intent is "seldom proven by direct evidence."[90] Rather, parties rely on circumstantial evidence using the traditional so-called "badges of fraud."[91] "The Eleventh Circuit has adopted the badges of fraud contained in the Florida fraudulent transfer statute." [92] These indicators or "badges" of fraud allow a Court to infer the transferor's intent. But, the presence or absence of one or many of the badges is not determinative.  The Court rather must look at the totality of the circumstances surrounding the transfers.

The Trustee argues five badges of fraud apply: (i) Goble was an insider of NACI, (ii) NACI could not pay its bills as they became due and/or was undercapitalized, (iii) NACI did not receive reasonably equivalent value for the transfers, (iv) NACI removed or concealed assets, and (v) before NACI made the Transfers, FINRA filed a complaint against NACI.

The Court rejects the Trustee's argument of actual fraud.  Although Goble, as sole indirect owner of NACI and member of its board of directors is an insider of NACI, the company was paying its bills on time, was not undercapitalized, received reasonably equivalent value for the Transfers, and did not improperly use, conceal, or remove assets, including customer monies. The Court specifically finds that the Transfers largely pre-dated FINRA's complaint against

---

[90] *Toy King Distributors,* 256 B.R.1, 127 (Bankr. M.D. Fla. 2000).
[91] *In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 849-50 (Bankr. M.D. Fla. 2005).
[92] The badges of fraud are as follows:
    (a) The transfer or obligation was to an insider.
    (b) The debtor retained possession or control of the property transferred after the transfer.
    (c) The transfer or obligation was disclosed or concealed.
    (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
    (e) The transfer was of substantially all the debtor's assets.
    (f) The debtor absconded.
    (g) The debtor removed or concealed assets.
    (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
    (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred.
    (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
    (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
*In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998).

NACI lodged in Fall 2007.  The Transfers were an established pattern of payment by NACI to Goble and were not in response or even remotely connected to the FINRA complaint.  No other badges of fraud exist. [93]  The Trustee did not prove actual fraud.  Count II and the related Count V to avoid the Transfers under Section 550 of the Bankruptcy Code fail.

### No Breach of Fiduciary Duty or Unlawful Distributions Occurred (Counts VI and VII)

In Count VI, the Trustee argues that Goble breached his fiduciary duties of loyalty and care by directing the Transfers while NACI was undercapitalized.[94] Because the Court already has held the Trustee proved no deficiency in NACI's capitalization, the Court can find no breach of any duty Goble owed NACI.  Count VI fails.

In Count VII, the Trustee asserts a claim under § 607.0834 of the Florida Statutes, alleging the Transfers represented unlawful distributions. To support a finding of liability for "unlawful distributions," a plaintiff must establish that the director did not perform his requisite statutory duties. The Trustee did not establish that Goble failed to perform any such duty imposed upon him by § 607.0830 of the Florida Statutes. Count VII fails.

### Conclusion

The Trustee did not prove any legal basis to avoid the Transfers made by NACI to Goble. A separate Final Judgment finding in favor of Goble and against the Trustee on all Counts shall be entered simultaneously with this Memorandum Opinion.

DONE AND ORDERED in Orlando, Florida, on September 29, 2014.

KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

---

[93] *See In re XYZ Options, Inc.*, 154 F.3d 1262, 1271-72 (11th Cir. 1998); *In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998) (applying Florida badges of fraud).
[94] *See* Fla. Stat. § 607.0830(1); *In re Aqua Clear Tech*, 361 B.R. 567, 574 (Bankr. S.D. Fla. 2007).

Hywel Leonard, Attorney for Plaintiff, is directed to serve a copy of this Order on interested parties and file a proof of service within 3 days of entry of the Order.

| Attachment A to Memorandum Opinion | | | | |
|---|---|---|---|---|
| **Transfer Summary** | | | | |
| **Total Transfers:** | $527,064.04 | | | |
| | | | | |
| **Four-Year Transfers** | | | | |
| *Type* | *Payment* | *Date* | | |
| Credit Card Transfer | $9,273.14 | 6/8/2006 | | |
| | $15,119.21 | 7/14/2006 | | |
| Miscellaneous | $369.00 | 6/8/2006 | | |
| | $761.00 | 7/17/2006 | | |
| AT&T | $147.13 | 6/1/2006 | | |
| | $144.75 | 7/13/2006 | | |
| Cingular | $124.84 | 6/20/2006 | | |
| | $28.76 | 7/14/2006 | | |
| | $36.43 | 7/14/2006 | | |
| *Total Four-Year Transfers* | $26,004.26 | | | |
| | | | | |
| **Two-Year Transfers** | | | | |
| *Type* | *Totals* | | | |
| **Business** | $255,282.06 | | | |
| *Business Credit Card Charges* | $238,628.17 | | | |
| *Cell Phone Payments* | $9,183.96 | | | |
| *Other business* | $7,469.93 | | | |
| **Non-business** | $245,777.72 | | | |
| *Non-business Credit Card Charges* | $232,739.35 | | | |
| *Life insurance* | $2,805.00 | | | |
| *Other non-business* | $10,233.37 | | | |
| *Total Two-Year Transfers* | $501,059.78 | | | |

| Attachment A to Memorandum Opinion | | | | |
| --- | --- | --- | --- | --- |
| | | **Two-Year Transfers** | | |
| Type: | Cell phone | Life Insurance | Credit Card | *Credit Card Delineation* | |
| Total: | $9,183.96 | $2,805.00 | $471,367.52 | Business: | $238,628.17 |
| Transfers: | $144.58 | $302.50 | $9,265.11 | Non-Bus: | $232,739.35 |
| | $145.72 | $1,100.00 | $13,648.69 | | |
| | $142.67 | $302.50 | $22,566.61 | | |
| | $142.48 | $1,100.00 | $24,176.58 | | |
| | $141.09 | | $11,902.19 | | |
| | $142.77 | | $23,000.00 | | |
| | $147.13 | | $818.96 | | |
| | $158.03 | | $5,535.67 | | |
| | $158.24 | | $10,090.24 | | |
| | $157.19 | | $27,897.87 | | |
| | $159.38 | | $28,908.67 | | |
| | $156.64 | | $11.62 | | |
| | $296.99 | | $51,729.58 | | |
| | $161.01 | | $15,023.00 | | |
| | $280.59 | | $19,826.77 | | |
| | $158.23 | | $15,544.25 | | |
| | $1,282.53 | | $2,061.99 | | |
| | $155.42 | | $15,824.08 | | |
| | $539.51 | | $16,502.53 | | |
| | $271.51 | | $27,555.45 | | |
| | $265.59 | | -$5,000.00 | | |
| | $425.92 | | -$1,600.62 | | |
| | $278.31 | | $32,115.24 | | |
| | $269.53 | | $10,176.16 | | |
| | $278.01 | | $14,372.32 | | |
| | $193.21 | | $12,561.46 | | |
| | $314.08 | | $6,354.84 | | |
| | $269.53 | | $12,449.58 | | |
| | $180.30 | | $15,986.85 | | |
| | $156.78 | | $32,061.83 | | |
| | $280.52 | | | | |
| | $173.51 | | | | |
| | $103.79 | | | | |
| | $104.49 | | | | |
| | $102.54 | | | | |
| | $106.62 | | | | |
| | $116.02 | | | | |
| | $106.62 | | | | |
| | $101.12 | | | | |
| | $187.17 | | | | |
| | $143.74 | | | | |
| | $84.85 | | | | |

| Attachment A to Memorandum Opinion | | | | |
|---|---|---|---|---|
| | | **Two-Year Transfers (cont.)** | | |
| Type: | Other(Bus.) | *Description* | Other (non-Bus) | *Description* |
| Total: | $7,469.93 | | $10,233.37 | |
| Transfers: | $7,135.08 | *Prop. Taxes* | $4,663.74 | *(9) Medical Reimbursements* |
| | $84.85 | *TV* | $104.20 | *Auto tag renewal* |
| | $250.00 | *Taxi on bus trip* | $1,546.74 | *Unexplained law firm expense* |
| | | | $3,918.69 | *Unexplained payments to Goble* |

4YR CC Transfers - Paid for CC Transactions incurred through 7/25/06

2-YR Business CC Charges

| Year | Post Date | Charge | | Total 2YR Business CC Charges |
|------|-----------|--------|---|-------------------------------|
| 2006 | 8/1/2006 | $159.07 | | $238,628.17 |
| | | $239.25 | | |
| | | $11.55 | | |
| | | $186.22 | | |
| | | $430.08 | | |
| | | $245.00 | | |
| | | $245.00 | | |
| | | $2,581.38 | | |
| | | $361.09 | | |
| | | $267.10 | | |
| | | $267.10 | | |
| | | $335.02 | | |
| | | $1,500.00 | | |
| | | $356.00 | | |
| | | $287.11 | | |
| | | $139.21 | | |
| | | $302.10 | | |
| | | $10.00 | | |
| | | $64.99 | | |
| | | $3,188.10 | | |
| | | $343.71 | | |
| | | $3,195.00 | | |
| | | $2,894.99 | | |
| | | $288.85 | | |
| | | $3,003.10 | | |
| | | $267.10 | | |
| | | $778.91 | | |
| | | $401.10 | | |
| | | $102.25 | | |
| | | $141.30 | | |
| | | $398.10 | | |
| | | $223.10 | | |
| | | $470.29 | | |
| | | $385.24 | | |
| | | $110.80 | | |
| | | $5.34 | | |
| | | $316.11 | | |
| | | $871.00 | | |
| | | $199.00 | | |
| | | $2,009.44 | | |
| | | $53.49 | | |
| | | $584.28 | | |
| | | $420.72 | | |

|      |          |            |
|------|----------|------------|
|      |          | $397.10    |
|      |          | $567.10    |
|      |          | $802.49    |
|      |          | $4,045.60  |
|      |          | $620.90    |
|      |          | $34.76     |
|      |          | $540.72    |
|      |          | $29.46     |
|      |          | $15.05     |
|      |          | $13.80     |
|      |          | $2,072.78  |
|      |          | $2.22      |
|      |          | $102.57    |
|      |          | $4,581.00  |
|      |          | $265.65    |
|      |          | $445.61    |
|      |          | $427.98    |
|      |          | $228.93    |
| 2007 | 1/5/2007 | $29.55     |
|      |          | $318.92    |
|      |          | $189.00    |
|      |          | $21.85     |
|      |          | $214.00    |
|      |          | $1,040.00  |
|      |          | $137.88    |
|      |          | $914.60    |
|      |          | $59.00     |
|      |          | $165.85    |
|      |          | $250.76    |
|      |          | $120.00    |
|      |          | $421.30    |
|      |          | $399.30    |
|      |          | $399.30    |
|      |          | $25.00     |
|      |          | $21.27     |
|      |          | $281.65    |
|      |          | $219.27    |
|      |          | $1.98      |
|      |          | $204.70    |
|      |          | $169.86    |
|      |          | $158.84    |
|      |          | $14,504.00 |
|      |          | $315.34    |
|      |          | $0.12      |
|      |          | $82.38     |
|      |          | $971.29    |
|      |          | $971.29    |

$1,094.29
$23,400.00
$16.00
$61.81
$42.09
$52.45
$4.42
$29.42
$24.43
$50.75
$66.32
$524.70
$150.00
$150.00
$150.00
$150.00
$306.40
$109.85
$25.00
$150.30
$356.31
$2,670.70
$9.42
$4.71
$52.40
$57.10
$42.97
$32.97
$329.40
$1,284.00
$22,500.00
$301.05
$429.95
$291.25
$64.19
$132.38
$262.32
$56.54
$4,076.00
$4,076.00
$2,954.00
$123.25
$4,399.03
$9,567.66
$347.63
$425.00
$12,580.90

$4,179.86
$457.34
$104.84
$1,600.62
$508.80
$307.80
$923.40
$615.60
$8.50
$427.99
$243.80
$303.80
$247.61
$1,922.79
$1,410.22
$21.39
$944.78
$112.32
$63.18
$12.75
$7.45
$8.08
$2,853.90
$18.82
$8.08
$865.00
$4.79
$21.75
$8.50
$26.91
$16.35
$7.34
$4.00
$1.07
$21.68
$17.76
$33.75
$1.07
$2.12
$9.95
$185.00
$99.90
$33.61
$12.11
$51.02
$7.45
$124.49

$14.04
$50.68
$244.80
$230.79
$230.79
$298.80
$271.80
$287.80
$448.80
$329.81
$58.00
$182.06
$138.80
$188.80
$278.80
$333.80
$333.80
$333.80
$463.80
$228.80
$281.60
$228.30
$293.80
$22.18
$174.80
$303.80
$303.80
$823.75
$260.60
$228.80
$228.80
$228.80
$228.80
$159.59
$69.40
$173.40
$534.80
$25.58
$214.40
$519.80
$50.00
$1,000.00
$352.80
$352.80
$238.80
$203.80
$203.80

$138.80
$206.40
$206.40
$727.95
$225.94
$324.00
$5,411.99
$45.20
$10.00
$179.50
$179.50
$855.98
$3,180.00
$203.54
$208.34
$150.39
$5.24
$9.49
$3.12
$128.39
$855.98
$149.96
$427.99
$833.98
$420.08
$245.21
$91.15
$145.50
$766.99
$32.91
$105.22
$36.18
$236.80
$150.90
$98.56
$5.00
$39.00
$108.20
$230.50
$22.42
$31.09
$26.74
$164.97
$511.74
$624.53
$296.34
$5,349.85

|      |           |
|------|-----------|
|      | $90.00    |
|      | $200.00   |
|      | $575.00   |
|      | $293.76   |
|      | $100.00   |
|      | $18.00    |
|      | $30.97    |
|      | $31.25    |
|      | $24.00    |
|      | $24.00    |
|      | $57.51    |
|      | $6.39     |
|      | $487.50   |
|      | $658.00   |
|      | $28.14    |
|      | $358.37   |
|      | $53.01    |
|      | $33.26    |
|      | $14.72    |
|      | $20.61    |
|      | $28.85    |
|      | $37.32    |
|      | $0.36     |
|      | $0.42     |
|      | $77.12    |
|      | $273.80   |
|      | $22.92    |
| 2008 | $342.75   |
|      | $259.00   |
|      | $219.00   |
|      | $219.00   |
|      | $150.12   |
|      | $65.99    |
|      | $461.92   |
|      | $461.92   |
|      | $263.97   |
|      | $263.97   |
|      | $461.93   |
|      | $461.93   |
|      | $65.99    |
|      | $65.99    |
|      | $150.00   |
|      | $150.00   |
|      | $2,931.69 |
|      | $529.50   |
|      | $271.98   |
|      | $178.67   |

$10.00
$186.20
$1,765.46
$10.00
$408.96
$10.98
$1.38
$5.34
$3.30
$5.88
$1.44
$5.94
$2.16
$0.84
$147.78
$6.78
$363.72
$3,037.50
$26.68
$1,120.00
$3,628.59

END CC XFERS

Other Employee Disbursements

| | | |
|---|---|---|
| 4-Year | $369.00 | |
| | $761.00 | $1,130.00 |
| Medical | $348.00 | |
| | $159.00 | |
| | $235.39 | |
| | $1,348.68 | |
| | $100.68 | |
| | $136.00 | |
| | $636.00 | |
| | $199.99 | |
| | $1,500.00 | $4,663.74 |
| Other | $715.30 | |
| | $377.49 | |
| | $271.90 | |
| | $2,554.00 | $3,918.69 |
| Business | $250.00 | $250.00 |
| | | $9,962.43 |